**Delores CLARK et al., Plaintiffs,**

**v.**

**The BOARD OF DIRECTORS OF the LITTLE ROCK SCHOOL DISTRICT et al., Defendants.**

**Grover Richardson et al., and mothers similarly situated as a Committee to Save Horace Mann School, Intervenors,**

**Dr. George Lay et al., Parents of children, pupils in the Little Rock School District, Intervenors.**

**No. LR-64-C-155.**

United States District Court, E. D. Arkansas, W. D.

July 16, 1971.

See also D.C., 328 F.Supp. 1197.

John W. Walker and Philip E. Kaplan, Little Rock, Ark., for plaintiffs.

Herschel H. Friday, Robert V. Light and G. Ross Smith, Little Rock, Ark., for defendants.

Christopher C. Mercer, Jr., Little Rock, Ark., for intervenors Richardson and others.

James L. Sloan, Little Rock, Ark., for intervenors Lay and others.

MEMORANDUM OPINION

HENLEY, Chief Judge.

This litigation which involves the racial integration of the public schools of the City of Little Rock, Arkansas, and which has been in the courts for some sixteen years is again before the Court pursuant to an order of the Court of Appeals entered on May 4, 1971, remanding the case for further consideration.[1] The Court was directed to call upon the defendants to submit a new integration plan conforming to the requirements of the four decisions of the Supreme Court handed down on April 20,[2] to conduct appropriate hearings, and to rule on the new plan not later than August 1.

The Court promptly entered an order calling on the School District to submit a new plan which was done on June 8. An extensive hearing which consumed three days was commenced on June 16. On June 21 the Court conducted a hearing in connection with a plan submitted by the North Little Rock School District which has integration problems quite similar to those of Little Rock. At the conclusion of that hearing the Court directed the defendants in this case to submit an alternative plan designed to eliminate what the Court considered to be a patently discriminatory situation that would have been created

1. On the same day the Court of Appeals entered a similar order remanding the case involving the public schools of North Little Rock. Both cases had been pending in the Court of Appeals in connection with appeals taken from decrees entered by this Court in the late summer of 1970 which permitted the schools to operate under certain conditions during the 1970–71 school year.

2. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586, and McDaniel, Superintendent of Schools v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 23 L.Ed.2d 582. Of those decisions the Charlotte-Mecklenburg case is the most important; its companion case, North Carolina State Board of Education v. Swann is also of substantial significance.

under the June 8 plan. The alternative plan was submitted on June 28, and a hearing on it was held on July 12. The Court will call the June 8 plan "Plan I" and the June 28 plan "Plan II." Both plans have been given careful consideration along with other questions included in the remand of the case. This memorandum opinion incorporates the Court's findings of fact and conclusions of law with respect to the issues before it.

Historically, the Little Rock public schools have been operated on what is known as the 6–3–3 basis; that is to say, the system had six elementary grades, three junior high grades, and three senior high grades. Up until the comparatively recent construction of the Parkview High School in the western part of the City, the District operated four senior high schools. The oldest of those schools was Central High School which is located in what was the central part of Little Rock when the school was built; it was constructed as a "pre-Brown" school for the education of white students only. Horace Mann High School, a facility of more recent construction, was built in a predominantly Negro section in the eastern part of the City and has always been identifiable as a Negro school. Hall High School was built after the Brown decisions were rendered; it is located in the western part of the City in an essentially all white neighborhood and until a very short time ago was an all white school. The fourth school was Metropolitan High School, a fully integrated vocational-technological institution which has never really been in controversy in this litigation.

Last year the District operated five high schools, Central, Mann, Hall, Metropolitan, and Parkview. Parkview, like Hall, is located in a nearly all white affluent neighborhood, and is substantially to the south and west of Hall.

The junior high school system consisted of seven schools located in various parts of the City and prior to the 1970–71 school year just about all of them were racially identifiable, some of them notably so.

There were some 31 elementary schools located throughout the City and in accordance with the neighborhood school concept. Since housing in Little Rock is de facto segregated, the elementary schools were naturally racially identifiable. They still are.

In 1969 the late Judge Gordon E. Young approved a desegregation plan for Little Rock which the Court of Appeals found insufficient as far as student body desegregation was concerned, although the appellate court noted that substantial progress in that area had been made. Clark v. Board of Education, 8 Cir., 426 F.2d 1035 (1970). The holding of the District Court was reversed, and the cause was remanded for further proceedings.

A new plan was filed which this Court considered in August 1970. In a decree entered on August 17, 1970, the Court approved the plan in part and disapproved it in part as an operating plan for the 1970–71 school year. As far as the high schools were concerned, the Court approved the plan, including the aspect which involved the phasing out of Mann as a senior high school, provided that the Board made certain commitments mentioned in the decree and in the accompanying memorandum opinion. As far as elementary students were concerned, the plan contemplated their continued assignments to neighborhood schools, and that aspect of the plan was approved for 1970–71. The plan for the junior high schools was disapproved. As to them, the decree provided:

> "* * * The District is now mandatorily enjoined to proceed forthwith to commence the disestablishment of the dual junior high school system that it is now operating; the disestablishment of that system must be effectively commenced as of the beginning of the 1970–71 school year and must be completed as of the beginning of the 1971–72 school year. By September 1, 1970 the District will file a

statement with the Court setting forth what it proposes to do with respect to 1970–71 and what it expects to do with respect to 1971–72 * * *."

The statement called for by the decree was filed, and this Court considered the junior high school situation again in late September 1970. The junior high school plan was finally approved for 1970–71 only. Clark v. Board of Education, E.D.Ark., 316 F.Supp. 1209 (1970).

Appeals were taken from the Court's orders of August and September, 1970 and were still pending when the Supreme Court handed down its most recent school decisions heretofore mentioned.

One of the matters that the Court considered in August 1970 was certain proposed construction at the Henderson Junior High School located in the western part of the City. However, the record made up on that issue was scanty, not much emphasis was laid on it, and the Court passed it over lightly. During the pendency of the appeals the Court of Appeals entered a limited order of remand directing the Court to consider the matter of the Henderson construction more fully. The Court did so and found that the construction was proper and would neither help nor hinder integration, and the Court refused to enjoin the prosecution of the work. However, the Court of Appeals entered an order last December restraining the construction until the basic controversies before it should be decided.[3] The current order of remand vacates the injunction issued by the Court of Appeals and directs this Court to consider the Henderson construction again, which has been done. The matter will be dealt with in this opinion along with other issues.

In formulating Plan I now before the Court the School Board decided on a drastic restructuring of the overall school system. That involved the abandonment of the old 6–3–3 system and the substitution therefor of a 5–3–2–2 system. Under Plan I Grades 1–5 may be considered elementary grades; Grades 6–8 may be considered "middle grades;" Grades 9–10 may be considered junior high school grades; and Grades 11–12 may be considered senior high school grades.

Plan I makes no change in the existing method of assigning elementary students to their schools. They will still attend schools located in accordance with the neighborhood school concept. There would be a closing of some elementary schools which would increase to some extent the degree of integration in other elementary schools. It is clear, however, that racially identifiable schools would continue to exist.[4]

Children in Grades 6–8 would be educated in four "middle schools" or middle school complexes and would be assigned to schools on the basis of geographical attendance zones. Under Plan I almost 49 percent of the District's total middle school Negro enrollment would attend the Gibbs-Dunbar complex located in a predominantly Negro section of the City, and nearly 95 percent of the enrollment in that complex under Plan I would be black.

Plan I makes use of Horace Mann High School and Central High School for the education of students in the 9th and 10th grades and of Hall and Parkview High Schools for the education of 11th and 12th grade students. Students in those four grades would be assigned to schools on the basis of geographical zones, and it appears to the Court that Plan I would achieve essential racial balance at those four grade levels.

Another facet of Plan I which should be mentioned is that it would pair the formerly predominantly Negro Booker Junior High School with Metropolitan

3. Similar work on an elementary school in the North Little Rock District was also enjoined pendente lite by the Court of Appeals.

4. The same situation obtains in North Little Rock where, as in Little Rock, housing is de facto segregated.

High School so as to create an advanced vocational-technical education complex, attendance at which would be entirely voluntary and completely unrelated to the race of students desiring an education of that type. Students completing their course of vocational training would be ceremonially graduated from either Hall or Parkview both of which are schools fully accredited by the North Central Association of Secondary Schools and Colleges.

The striking racial imbalance that would exist at the Dunbar-Gibbs complex (hereinafter called simply Dunbar) is what caused the Court to call upon the Board to produce what has become Plan II. Plan II, which the Board does not actively advocate, contains a suggestion for the elimination of Plan I's racial imbalance at Dunbar and for balancing racially all of the middle schools in the District. That would be done by dispersing large numbers of Negro students who normally would go to Dunbar among the other middle schools and replacing them with white students transferred from other sections of the City. While racial balance could thus be achieved in all of the District's middle schools, given financial and logistical means, it is clear that the suggested revision of Plan I would involve the daily transportation of large numbers of students of both races to and from school each day. The Board objects to providing that transportation pointing to its high cost and the difficulty in obtaining buses on short notice.

As an alternative the Board suggests, but again does not advocate, a restructuring of the secondary grades so that the overall system would be a 5–2–2–3 system. Under that system, which would not substantially affect elementary students, students in Grades 6 and 7 would go to one group of schools; students in Grades 8 and 9 would go to another group of schools; and students in Grades 10–12 would attend Central, Hall, and Parkview High Schools.

Under that arrangement the schools for eighth and ninth graders would be Booker, Dunbar, Mann, and Pulaski Heights.[5] Negroes make up 39.2 percent of the District's enrollment in the eighth and ninth grades; the use of the arrangement now under discussion would create Negro minorities in all of the eighth and ninth grade schools and would achieve good racial balance in all of those schools. The percentages would vary from 36.7 at Booker to 41 percent at Mann; and the black majority that would exist at Dunbar under Plan I would be converted into a minority of 38.4 percent under Plan II. The arrangement would also come very close to achieving exact racial balance in the sixth and seventh grade schools which would be three in number.

But, the Board has no more relish for eliminating the racial imbalance at Dunbar under the 5–2–2–3 structure than it has for eliminating it under the 5–3–2–2 structure. As stated, the Board prefers the latter structure, and it states in Plan II that a predominantly black Dunbar is an integral part of that structure. As another alternative, Plan II suggests that the Board be permitted to retain Dunbar as a predominantly black school but with a substantially reduced enrollment at least during the 1971–72 school year.

Before passing on the questions presented in connection with the assignments of students to schools, the Court desires to dispose of what it considers to be subsidiary issues in the case.

## I.

The plan submitted by counsel for plaintiffs and intervenors calls for staff and faculty assignments on the basis of objective criteria, principally seniority. Specifically, this plan calls for Central and Hall High Schools to be the graduating high schools, and counsel suggests that Mr. Harry Carter, the present principal at Central, be retained in his post, and that the other principalship be given

5. Plan II seems not to envision the Booker-Metropolitan complex contemplated by Plan I.

to Mr. Edwin Hawkins who has been the principal at Mann.

The Court is convinced that the District's staff and faculty have been essentially desegregated although the Court is aware that some black employees of the District may be dissatisfied with their individual assignments or may be concerned about their status or job security as integration proceeds.

While the Court is not inclined to minimize that dissatisfaction and concern, the Court thinks that today, as in years past, the Little Rock District's principal integration problem relates to student assignments, and until that problem is solved satisfactorily the Court is not inclined at this stage to interfere with individual assignments of staff members and teachers or to impose on the Board objective criteria in such assignments to the exclusion of everything else.

The Board, the Superintendent of Schools, and the Principals know, of course, that they may not lawfully discriminate against any employee of the District on the basis of race, and they know that Negro administrators and teachers may not constitutionally be required to bear the full or a disproportionately heavy part of the burden of desegregation.

In the circumstances the Court will decline to make any further positive requirements of the District in the area of staff and faculty desegregation at this time. There are, however, some comments that the Court wishes to make.

As far as staff and faculty desegregation is concerned, the Court thinks it fair to say that the Negroes who are most immediately and urgently affected by the conversion of the Little Rock schools from a dual to a unitary system are those who have been employed at the senior high school level at Mann which under either Plan I or Plan II will no longer exist as a senior high school.

Principal Hawkins who has been mentioned has been a successful principal at Mann for a number of years. He has applied for employment as a principal at one of the other high schools. Superintendent Parsons testified on July 12 that as far as he knows Mr. Hawkins is qualified to serve as a principal at one of the other high schools. The Court thinks that the Board would do well to give serious consideration to hiring him in that position or in some other significant administrative position consistent with his training and experience.

The Court thinks too that the Board should make every effort to incorporate into the unitary system specialized Negro personnel such as athletic coaches, band directors, and similar categories of employees.

Finally, the Court thinks that in assigning Negro teachers heretofore employed at Mann to other schools in the District the Board should not only put them in classrooms and give them pupils to teach but should also take into account certain paraeducational interests held by some individual black teachers.

## II.

The question of the construction at Henderson need not delay us long. The Court dealt exhaustively with that construction in a memorandum opinion filed on December 8, 1970, and will not stop to repeat or paraphrase what it had to say in that opinion. There are some 26,000 people who reside in the general area served by Henderson; the school is needed, and the construction is needed; substantial sums amounting to above $100,000 have been spent already that will be lost if the construction cannot proceed. The Court is convinced as it was last December that the work that has been contracted will not adversely affect integration.

No further immediate construction of any significance is contemplated by the District at this time. When some construction that the Board does have in mind for the future becomes imminent, it will be time enough to consider its constitutional propriety.

Before leaving this subject the Court desires to emphasize that the concern of a federal court with local school construction is a strictly limited one. Whether, and where and to what extent public schools should be built or improved are questions that address themselves primarily to the judgment and discretion of local school officials; and federal courts should not interfere with their decisions unless it is clear that a particular project or contemplated project will militate against the school board's achievement of its constitutionally required objective to establish and operate a racially non-discriminatory school system.

Since the Court is convinced that the Henderson construction will have no impact on integration, the Court does not consider that the question of whether that construction should proceed is a constitutional one, and as far as the Court is concerned, the construction may proceed.

III.

The most recent decisions of the Supreme Court, heretofore cited in the margin, really express very little that is new. Considered collectively, they sum up, restate, and to some extent clarify principles already established by its own earlier decisions and by numerous decisions of the Courts of Appeals which have dealt extensively with school desegregation. It seems to the Court that the April holdings may be summarized substantially as follows:

1. "State imposed segregation" of the races in the public schools is unconstitutional. Perhaps unfortunately, the term "State imposed segregation" is not defined with precision. No clear answer is given to the question of where State action stops and purely private action begins.

2. In school districts like Little Rock and North Little Rock where dual school systems of racially identifiable schools were originally established by law, those dual systems must be abolished and must be replaced by unitary systems in which no schools can be identified as "black schools" or "white schools."

3. A school is racially identifiable if it is obviously designed or intentionally used primarily for the education of students of a particular race. A school may be identified racially by reference to faculty, facilities, or student body.

4. The Constitution does not require precise or exact racial balance of faculties or student bodies in every one of the schools of a district or at all times. However, the achieving of substantial racial balance is an effective and permissible means of disestablishing a dual school system.

5. A state may not use its legislative or other powers to thwart a school district in carrying out its constitutional duty to integrate its schools, and local school authorities have a broad discretion in determining the means to be employed in arriving at the required goal of a unitary system.

6. The means available to a school district faced with the task of integration include the assignment of students to schools on the basis of race and the closing, grouping, and pairing of schools, where necessary to replace an unconstitutional dual system with a unitary one.

7. With specific regard to "busing," the practice is not prohibited by the Civil Rights Act of 1964 or otherwise, and is a permissible tool to achieve integration. The Court did not say in express terms that busing is constitutionally required if necessary to achieve integration. However, in its most recent opinion dealing with the North Little Rock schools, Davis (formerly Graves) v. Board of Education, E.D.Ark., 328 F.Supp. 1197 (1971), this Court felt impelled to predict reluctantly that sooner or later the federal appellate courts will require busing if that is the only means whereby a school district can be integrated.

8. In the last analysis a federal district court sitting in a school integration case exercises the traditional func-

tion of a court of equity in any case involving the fashioning of equitable remedies. That is to say, it exercises its judicial discretion with due regard to practical considerations. Such a court in such a case is concerned with remedying a constitutional wrong if its exists; it is not concerned with non-constitutional questions or with matters lying properly within the administrative judgment and discretion of local school authorities.

With that summary in mind, the Court now turns to a consideration of the basic issue in the case, the constitutional sufficiency of the plans. Other things being equal, an integration plan which commends itself to popular approval and support is to be preferred to one that does not; and similarly an integration plan that is educationally sound is to be preferred over one that is educationally unsound or less sound. But, while the Judge of the Court as a citizen is interested in those considerations, the Court is not ultimately concerned with them. In the last analysis what the Court is concerned with here is whether the plans before it are sufficient to disestablish the dual school system which has prevailed heretofore in Little Rock and to replace it with a unitary system as is now constitutionally required.

IV.

Neither the Court nor the Board is writing on a clean slate. The plans now before the Court must be considered and evaluated not only by reference to their contents but also against the backdrop of the long history of this case and the general trend of judicial decisions in the field of school desegregation which was mentioned in Davis, supra, 328 F.Supp. 1197.

Taking up first the secondary schools which are Grades 6–12 under either Plan I or Plan II, the District was mandatorily enjoined by this Court in 1970 to integrate its secondary grades completely by the beginning of the 1971–72 school year and to keep them integrated. The Court's decree was not stayed, and in the Court's opinion the Board never had any real reason to expect that either the Court of Appeals or the Supreme Court would permit it to open school this fall with a dual secondary school system although it might reasonably have entertained some hope that it would be permitted to continue to operate its elementary schools on the basis of the neighborhood school concept. In any event, that portion of the decree is still in force, and that is the starting point of evaluation of the plans now under consideration.

From a constitutional standpoint it makes no difference whether the Little Rock schools have a 5–3–2–2 structure, or a 5–2–2–3 structure, or some other structure as long as the system is a unitary rather than a dual one. Therefore, as far as structure is concerned both Plan I and Plan II are satisfactory from a constitutional standpoint. From an educational standpoint Plan I has some advantages over Plan II, but Plan II has its own advantages over Plan I.

Plan I, as now drawn, does not comply with the Court's 1970 decree relating to the secondary schools because it leaves Dunbar with a black enrollment of more than 90 percent which would quickly become 100 percent. That will not do.

While the Supreme Court in the Charlotte-Mecklenburg case suggests that an all black school might in certain circumstances bear constitutional scrutiny, the Court does not think that that suggestion is applicable to Dunbar. Dunbar did not become an all black school fortuitously or on account of shifts in population unrelated to racial segregation imposed by law. It was built as a black school in the days of de jure segregation in Arkansas. It was located purposely in a black neighborhood and under Plan I it would offer instruction to almost half of the District's black students at the middle school level. It would be automatically identified as an educational facility designed primarily for Negro students. Also, leaving Dunbar black will leave the other middle schools racially imbalanced whereas if the black majority

at Dunbar is eliminated and the students dispersed among the other middle schools, as the Board concedes can be done at least on paper, almost exact racial balance will be achieved in all of the District's middle schools, including Dunbar.

As a plan for the secondary schools, Plan I as now written will be disapproved.

If the Dunbar problem can be solved, the Court would have no trouble with student assignments in Grades 9–12 because under either Plan I or Plan II the racial identifiability of schools offering instruction at those grade levels would be destroyed.

Plaintiffs argue that both Plan I and Plan II unfairly and unconstitutionally place an undue burden on black students residing in the eastern and central parts of the City. That school integration that requires for its implementation the movement of students for substantial distances in order to attend the schools to which they are assigned imposes burdens on students of both races cannot be denied. And it appears to the Court that where in a bi-racial district like Little Rock where housing patterns are segregated and where one race is in a distinct minority, the "burden of integration" is necessarily going to bear more heavily on students of the minority race, whether the minority be black or white. That is true because in order to make the racial consists of all of the schools reflect in general the racial ratios of the overall population of the district, it is necessary to move a higher percentage of the members of the minority race than of the members of the racial majority. And that fact exists irrespective of any difference in the relative affluence of members of the two races.

The fact that residential housing in Little Rock is segregated is not the fault of the School Board and is a matter that is not within the control of either the Board or the Court. The schools have been built where they are, and it is too late in the day to scrap them and replace them with schools located more centrally or more conveniently to the bulk of the Negro population.

It is probably fair to say that to use Central as a graduating high school would substantially lessen the burden of integration on black high school students as a class since many of them would be assigned to that school which is closer to their homes than are Hall and Parkview to which they would be assigned under Plan I.[6] On the other hand, Plan I's burden on blacks at grade levels 11 and 12 would be to some extent offset by the corresponding burden placed on white students at grade levels 9 and 10.

As far as the elementary schools are concerned, the Court thinks it unrealistic to hope today, as the Court hoped in 1970, that if a school district fully integrates its secondary school system, it can assign elementary students to schools near their homes even though that method of assignment leaves the elementary schools racially identifiable.

In Davis v. Board of Education, supra, the Court held that the elementary school system of North Little Rock must be integrated as well as the secondary school system, and the Court can do no less in this case. Defendants concede that the elementary schools can be integrated by grouping and pairing of schools, and the defendants are going to have to do so.

## V.

The discussion in the preceding section of this opinion tacitly assumed that the Board would be able to implement any constitutionally acceptable plan that might be devised and discussion was limited to the sufficiency of the plans as plans. It must be realized, however, that the problem of student assignments in the Little Rock District, and in other

6. Entirely apart from any question of integration, there are strong arguments, educational and other, that can be made for retaining Central as a high school. And the Board's plan to relegate it to the status of a junior high school is a highly controversial one in Little Rock.

districts similarly situated, has two aspects. The sufficiency of an integration plan is one thing; the implementation of a sufficient plan is another thing. However, the two aspects of the problem blend into each other because the choice of a plan may well depend on whether and when it can be implemented. It is now necessary to talk about implementation. To put it bluntly, it is now necessary to consider the question of busing.

In Little Rock the real difficulty with school integration is not in formulating a plan that will serve the purpose; the problem lies in the implementation of an acceptable plan. That is true because in Little Rock, as in North Little Rock, the schools simply cannot be integrated without a massive transportation of students of all grade levels. The Little Rock School District today is in poor condition at best to provide transportation for large numbers of students and without such transportation hundreds of students will not be able to go to school if assigned to facilities located far from their homes. The problem is most acute at the elementary grade levels, but it also exists at the secondary grade levels.

The Court recognizes at the start that the whole idea of busing, particularly at the elementary grade levels and involving young children, is repugnant to the white patrons of the District as a class, and that their repugnance is shared by many if not most of the black patrons of the District. Parents of young children, whether black or white, simply do not like to have the children hauled long distances day after day merely to achieve racial balance in the schools.

This Court has never hesitated to express its opposition to busing for that purpose. Davis v. Board of Education, supra, 328 F.Supp. 1197; Clark v. Board of Education, supra, 316 F.Supp. at 1214; Graves v. Board of Education, E.D.Ark., 302 F.Supp. 136, 141–142 (1969); Graves v. Board of Education, E.D.Ark., 299 F.Supp. 843, 851 (1969). While the Court adheres to the views expressed in those opinions, it also adheres to its reluctant prediction made in Davis, supra, that the federal appellate courts will sooner or later require busing in districts like Little Rock and North Little Rock where full integration cannot be achieved by any other method. The real question on this phase of the case is not "whether" but "when." Two factors must be considered: cost and the availability of buses.

From its consideration of the evidence the Court finds that it would be financially and logistically impossible for the District to provide transportation during the 1971–72 school year for all of its students at all grade levels. The District lacks the money and could not acquire by purchase, lease, contract, or otherwise enough vehicles to do the job.

The Court further finds, however, that the District can with difficulty and at a substantial expense to its overall educational program provide necessary transportation this year for its students at grade levels 6–12. It will be required to do so, and it will also be required to achieve reasonable racial balance at Dunbar. The Court is not willing to accept the Board's alternative proposal set out in Plan II that it be permitted to retain Dunbar as a black school but with a reduced enrollment during the 1971–72 session.

As far as students in grades 1–5 are concerned, the Board will be permitted to assign them for this year only on the basis of geographical attendance zones as has been done in the past. As of the opening of school for the 1972–73 session, the elementary grades must be integrated satisfactorily, and well in advance of the commencement of that session the Board will be required to present a concrete plan for disestablishing the dual elementary school system.

The Court deems it well to comment further about transportation within the District at the secondary school level.

The estimated revenues of the District for the current fiscal year which will end on June 30, 1972, will exceed last year's revenues by about $1,000,000. Although, as stated, the District was or-

dered in 1970 to integrate its secondary grades completely by the opening of school this year, and although the District knew that in order to do that it would probably have to transport large numbers of students, it made no allocation whatever for such transportation when it prepared its operating budget for fiscal '72; nor did it take any steps to acquire any buses; nor did it apply to the State Department of Education for State aid for transportation purposes until after the hearing that the Court conducted in June of this year. An application for such aid has now been filed, and the District will be eligible to receive from the State $20 per year per transported child. If the District buys any buses, it will also be entitled to receive from the State an annual grant of $1,085 per bus.

While the Board does not desire to engage in any large scale transportation this year, it has stated that it will provide or undertake to provide such transportation as the Court may order regardless of the extent to which its educational program may be impoverished.

Satisfactory integration of the secondary grades this year will or may require the transportation of between 4 and 5 thousand students at grade levels 6–12. For purposes of discussion let it be assumed that transportation for 4,500 students may be required. The Board estimates that it will cost $90 per school year per child to provide the necessary transportation; on that basis the total cost would be $405,000.

The Court thinks that the Board's $90 per child estimate is considerably too high. In the course of the June hearing Mr. J. L. Eidson, Supervisor of School Transportation in the State Department of Education, testified that transportation costs vary inversely to population density, and that the average transportation cost in the State last year was $47.27 per transported child per school year. He also pointed out that during the 1968–69 school year the transportation cost in the Pulaski County Special School District which engages in extensive busing of students was only $27.15. However, that low figure loses a great deal of significance when it is realized that the Special District has not bought any new buses for several years.

While the Court thinks that the Board's estimate of $90 per child is too high, the Court does not think it realistic to compare the Little Rock District with the predominantly rural Special District in the field of transportation costs. For one thing, transportation of students in a large city involves many more starts, stops, and sharp turns than does transportation in a rural district, and for that reason is naturally more expensive. Further, rural districts frequently make use of coaches, janitors, teachers, parents, and older students as bus drivers, and the compensation paid to those drivers is frequently quite low—much lower than the Little Rock District may be expected to have to pay.

Nor does the Court think that Little Rock's transportation expense for its first year in the venture will be as low as the State average if for no other reason than that the District will face some initial expenses which other districts which have engaged in transportation longer will not have to bear.

The Court recalls from the testimony in the North Little Rock case that that District engaged in some limited transportation of poor students last year using federal funds and that the per pupil cost was about $55 per year.

All in all, the Court thinks that it will probably cost the District about $60 per child this year to provide the necessary transportation. That, of course, would amount to $270,000 gross, but since the District will be eligible to receive $90,000 as reimbursement from the State, the net cost should not exceed $180,000. Per pupil cost in later years should be less.

The Court does not think that the District would be able to buy enough new buses between now and September to transport all of the affected secondary grade students even if the Board desired to do so. Buying a school bus is a two step process. The school district

first buys a chassis and then turns it over to a manufacturer of bus bodies who builds the body and installs it on the chassis. The body manufacturer ordinarily does not build the body until he has the chassis. It takes about thirty days at best for a district to acquire a chassis; chassis supply varies seasonally, and the supply is short this time of year.

However, it appears to the Court that the Board, if it uses diligence, ought to be able to acquire some buses from some sources, and that it can make arrangements for others with private bus operators in this area, and that it can make arrangements with the Twin City Transit Co., which holds the franchise for general public transportation in Little Rock and North Little Rock, for the transportation of many students. Certainly, the transit company needs the business and would like to have it if it can be protected adequately from student vandalism, which is no small problem.

The Court realizes that the transportation facilities that the District will be able to furnish this year will probably not be luxurious or even particularly comfortable, but the Court thinks that they will do to get the students to and from school; and they will have to do.

The Court also realizes that the money that the District is going to have to spend for transportation will have to come out of funds that otherwise would be spent for increased salaries, educational supplies and materials, and for other conventional and desirable educational purposes. There is nothing that the Court can do about that. At this time at least the duty of the District to comply with the requirements of the Supreme Court, the Court of Appeals, and this Court in the matter of integration must take priority over ordinary educational considerations. There is legislation pending in Congress which, if enacted, may be of substantial help to the District financially; and there is always the possibility that the voters of the District will approve an increased millage for school purposes, although they are likely to prove most reluctant to do so.

The question arises as to whom the Board must offer transportation. At the three upper grade levels the Board would like to limit transportation to students who without it would be unable to attend school, and in any event would like to give preference to students residing long distances from their schools over students residing comparatively close to the schools to which they are assigned.

The Court thinks that initially the Board should be required to provide transportation to all secondary grade students who desire to be transported and who live more than two miles from their assigned schools, and the Board will be so required initially. If by mid-term it turns out that this puts an impossible burden upon the Board, it may apply to the Court for leave to provide transportation on a more limited basis taking into consideration such factors as financial need, distance from school, and age.

Some concern has been expressed that black students who attended Horace Mann High School last year will not be able or will find it difficult to participate during their senior year in student activities, such as athletics, at the schools to which they will be assigned. It is the Court's understanding that the school administration is working on that problem. It goes without saying that the students in question are entitled to participate fully in all phases of student life, and they should be encouraged to do so.

The "Three Year High School" aspect of Plan II contemplates that students who attended Central, Hall, and Parkview High Schools last year as eleventh graders may, if they wish, remain in attendance at and graduate from their old schools. The evidence is to the effect that this will not substantially affect racial balance in any of the three schools; it is a reasonable provision and will be allowed.

VI.

It is necessary for the Court to consider briefly an intervention filed on behalf of a number of Negro school patrons anxious to preserve Mann as a high school facility, and another intervention filed on behalf of some white patrons who apparently feel that the requirements of the Supreme Court can be met by assignments based on geographical attendance zones but with a full and complete right of a student to transfer from a school in which his race is in a majority to a school in which his race is in a minority.

The Court does not think that the proposal of the white intervenors would disestablish the existing dual school system or that it meets constitutional requirements. Their intervention will be dismissed.

As to the intervention of the black patrons, the Court understands and sympathizes with their failure to keep Mann open as a high school. The Court considered that problem in 1970 when it approved the phase-out of Mann origially. The Court thought then and thinks now that the question of whether to keep Mann open as a high school or whether to make other use of it was one that addressed itself to the administrative judgment of the Board and that it was not of constitutional magnitude. So, the intervention filed by the black patrons will be dismissed along with that filed by the white patrons.

VII.

The Court has considered the alternative plan submitted by plaintiffs and the original intervenors. Assuming that their plan would effectively integrate the schools, the Court is not going to impose it on the District.

Normally, the Court would leave it up to the Board to decide whether it wants a 5–2–2–3 structure or a 5–3–2–2 structure. However, to take that course would entail at least some more delay, and the Board might make some variations that would call for another hearing which would entail still more delay. As stated, the Court is mandated to decide this case and send it on its way not later than August 1 which is not far off. Further, the Court suspects that the Board actually wants the Court to make its choice for them.

The Court will do so initially and will opt for the 5–2–2–3 structure, with Central being retained as a graduating high school. As noted, there are good reasons, aside from integration, for continuing to use Central as a high school, its use as a high school will make integration somewhat less burdensome on the Negroes and should tend to decrease the drop-out rate of Negroes at the high school level; and the Superintendent of Schools who is responsible for the day to day operation of the schools seems to prefer three year high schools.

This, of course, does not mean that the Board will be committed permanently to a 5–2–2–3 structure if with respect to 1972–73 or any later year or years it desires to have a 5–3–2–2 structure or any other structure not characterized by racial discrimination, it will be free to make a change.

A decree in accordance with the Court's determinations will be entered. That decree will approve Plan I as it applies to the assignment of elementary school students for this year only with the stipulation, spelled out in the plan, that elementary students desiring to transfer from majority to minority situations may do so as a matter of right and that the District will provide transportation to the transferee schools; otherwise, Plan I will be disapproved.

The "Three Year High School Plan" set out in Paragraph 5 of the Supplementary Report of Defendants filed herein on June 28, 1971, will be approved, and the Board will be ordered to adopt it, fully implement it, and put it into effect as of the opening of the 1971–72 school year, and at least initially to provide transportation for all students at grade levels 6–12 who desire to be transported. The Board's request that it be permitted to operate Dunbar as an all

black or essentially all black school this year but with a reduced enrollment will be denied.

With further reference to the elementary schools, the decree will mandatorily enjoin the Board to disestablish completely effective as of the 1972–73 school year the existing system of racially identifiable elementary schools by means of pairing and grouping schools and assigning students to them so as to destroy their former racial identifiability.

In view of the fact that compliance with the decree will strain the District financially, the Court will not burden the Board additionally at this time by assessing any attorney's fee against it, but the District must pay the costs of this particular phase of the litigation.