**Ruth Polk PATTERSON, Plaintiff,**

**v.**

**Paul MASEM, Superintendent of the Little Rock School District, et al., Defendants.**

**No. LR–C–80–372.**

United States District Court, E.D. of Arkansas, W.D.

Sept. 13, 1984.

John W. Walker, Little Rock, Ark., for plaintiff.

G. Ross Smith, Little Rock, Ark., for defendants.

MEMORANDUM OPINION

HENRY WOODS, District Judge.

HISTORY OF LITIGATION

Plaintiff filed a class action complaint against Paul Masem, Superintendent of

Schools of the Little Rock School District, and members of the School Board on July 29, 1980. She alleged violations of 42 U.S.C. §§ 1981 and 1983 and Title VI and VII because she was not selected for the position of Supervisor of English and Social Studies in the District. She had previously held the position of Supervisor of Minority Studies, a position that was abolished. She was then made Supervisor of Human Relations, which plaintiff alleges to be a demotion. She also claims an infringement of her right of free speech because of her opposition to the production of the play *You Can't Take It With You* at Central High School in the spring of 1980. She also asked for a temporary injunction. After a two-day hearing before Judge Richard Arnold on August 8 and 9, 1980, Judge Arnold denied her request for a preliminary injunction but ordered that the person chosen for the supervisory position "hold that position temporarily only, pending the outcome of the trial on the merits, and the word 'acting' is to be added as a prefix to his title" (Order of August 11, 1980). The case was subsequently assigned to Judge William R. Overton, who granted plaintiff's motion for an extension of time until December 15, 1980 to file a motion for class certification. The case was subsequently assigned to me and plaintiff filed another request for an extension of time to move for class certification, which was granted until April 3, 1981. On that date a motion for class certification was filed. Plaintiff amended her complaint on April 27, 1981 and alleged that she had received her right to sue letter from EEOC on March 10, 1981. The case was set for a non-jury trial on July 26, 1982 and was later rescheduled for March 21, 1983. On March 10, 1983 plaintiff moved that this case be consolidated with *Clark v. Board of Education,* No. LR–C–64–155, the Little Rock school consolidation case presently assigned to Judge Overton. On the same date I was asked to recuse because my former law firm had allegedly filed an amicus brief in the *Clark* case about fifteen years previously. I declined to recuse, and on March 16, 1983 Judge Overton and I jointly denied the

motion to consolidate the *Patterson* and *Clark* cases, which rendered the motion to recuse moot (see my order of March 16, 1983). The Court's order of March 16, 1983 was appealed to the Court of Appeals by the plaintiff. The Court of Appeals dismissed the appeal on June 7, 1983. On November 9, 1983 I declined to certify a class in this case.

The events in this case occurred more than four years ago. The delay has been largely occasioned by various motions filed by plaintiff (recusal of trial judge, motion to consolidate) and also a class certification motion which required a hearing. All three motions were denied, but there was a further delay because plaintiff tried unsuccessfully to take an interlocutory appeal to the Court of Appeals. The case was tried on the merits on September 6, 1984. The testimony taken before Judge Arnold in 1980 was considered as well as additional testimony and exhibits introduced on September 6, 1983 including depositions of School Board members Sherril, McGee and Herron.

## FINDINGS OF FACT

Findings 1–5 were stipulated by the parties.

1. Plaintiff Ruth Polk Patterson is a citizen of the United States and a resident of the State of Arkansas. During the 1979–80 school term, she was employed by the Little Rock School District as Supervisor of Minority Studies.

2. Defendant Little Rock School District is a duly organized and existing school district in the State of Arkansas with power to contract and sue in the name of the District.

3. At all times material herein, Paul Masem was Superintendent of Schools of the Little Rock School District.

4. The position of Supervisor of English and Social Studies became available at the end of the 1979–80 school term, and plaintiff applied for the position. However, defendant School Board awarded the position of Supervisor of English and Social Studies

to Mr. Marvin Zimmerman, a District employee.

5. Subsequently, plaintiff was placed in another administrative position, Supervisor of Human Relations, which became effective in the 1980–81 school term.

Findings 6–9 were proposed by Plaintiff and not disputed by defendants.

6. This litigation was filed on July 29, 1980 by plaintiff seeking relief personally and on behalf of black staff pursuant to 42 U.S.C. §§ 1981, 1983 and 2000e–5 and various outstanding court decrees including, specifically, *Clark v. Board of Education of Little Rock*, 328 F.Supp. 1205 (E.D.Ark. 1971). The gist of plaintiff's action was that she was denied a promotion to the position of Supervisor of English and Social Studies for the Little Rock school system on or about July 1, 1980 due to her race and/or sex. This case was initially brought as a class action on behalf of blacks and females. The Court has considered and rejected the class allegations herein. Plaintiff filed a Motion for Preliminary Injunction on which a hearing was held by Judge Richard Arnold, then a U.S. District Judge, on August 8, 1980. Judge Arnold, now of the Court of Appeals for the Eighth Circuit, took testimony on August 8 and 9, 1980, which testimony has been transcribed and is before the Court for consideration.

7. Plaintiff Dr. Ruth Patterson is a black female who has a bachelor's degree with honors, a Master of Arts degree in English, and a doctorate degree from Emory University with numerous further hours from various universities throughout the country.

8. Robert Henry, Board President, felt that Dr. Patterson lacked sufficient managerial skills due to her relationship with the Central High incident. (This incident will be discussed, *infra.*)

9. Robert Henry wanted Dr. Patterson to spend a year in another position other than Supervisor of English and Social Studies so that he could judge whether or not she had the capability for making decisions.

10. The position to which plaintiff was appointed, Supervisor of Human Relations, was comparable in all respects to the eliminated position, Supervisor of Minority Studies, which plaintiff had previously held. Her appointment as Supervisor of Human Relations was in no sense a demotion.

11. In the spring of 1980, the Drama Department at Central High School produced a play for public performance entitled *You Can't Take It With You.* This play, written by Moss Hart and George S. Kaufman, won the Pulitzer Prize for drama in 1937. It had a long run on Broadway and was made into a successful motion picture, which won an Academy Award in 1938. A small group of teachers at the school objected to the play because in their opinion it characterized black people in an unfavorable way. Superintendent Paul Masem directed plaintiff to investigate the matter and report her findings to him. Masem's concern grew out of a meeting with Mrs. Cheryl Shull, the drama teacher who was putting on the play, Roosevelt Thompson, a black student who had a part in the play and who was also president of the student body, and Mr. Gene Hooks, the principal. Thompson reported that some students were being harassed by teachers because of their participation in the play. Roosevelt Thompson and Mrs. Shull regarded the criticism as unfounded.

12. Masem's instructions to Dr. Patterson were as follows:

I indicated that I thought the play was relatively far along, and it was pretty much what I just said; that I thought we ought to effect a compromise. And I asked her to go over to Central and see if she could assist Mr. Hooks in effecting a compromise, and indicated that if she did know the teachers, which she indicated to me that she did, that I thought it was very important that she alert them that that kind of thing had been reported to me, and that this harassment of students cease and desist. And I thought that having personal knowledge and a personal acquaintanceship with the teachers, that if there was anything that hap-

pened, she would be able to prevail to keep people cool. I recognized at this time, and I would say today, that emotions were very high. (TR Vol. III, pp. 51–52)

Plaintiff went to Central High School on or about March 10th and met with three of the black teachers who were protesting about the play. It is clear from the evidence that plaintiff completely agreed with their view and she ultimately became the spokesperson for the protesters, who became progressively more intense in their protests. The controversy reached the media and caused polarization in black students and faculty and much tension at Central High School.

13. There was a series of meetings concerning the play in which Dr. Patterson participated. The attitude of several of the black teachers, whose views were articulated and supported by Dr. Patterson, was that the dialogue must be modified to remove some objectionable language and that the roles in the play must be recast. In a meeting with the drama teacher, there was an agreement to change some of the language in the play (for instance, "colored" was eliminated from one of the lines), but the drama teacher refused to recast the roles, taking the position that it was too late for recasting. On April 3, 1980 Dr. Patterson then wrote the following memo to Mr. Masem recommending that the play be canceled:

After observing a rehearsal of the play, *You Can't Take It With You*, on Wednesday, April 2, 1980, I would like to report the following:

1. The script of the play has been revised to remove most of the objectionable words, expressions, and phrases.

2. No recasting was done to reflect a better racial mix in characterizations.

3. The play is still offensive to me, and Beverly White, who sat in on the rehearsal with me, concurs with my analysis of the tone of the play.

a. The play perpetuates the stereotype of white superiority/black inferiority, and portrays the ideology of white dominance/black subservience.

b. The play clearly reflects a separation of black and white relationships through the casting. The sad thing about this kind of directing is that the black students, *all four of them*, are playing their roles in a way that projects their own internalization of the white dominant/black subservient phenomenon.

4. I have reached the conclusion that nothing short of complete recasting, role-switching and redirecting can help this play.

5. In trying to work out solutions to the objections raised by the group of teachers at Central, I found the drama teacher's attitude to be uncooperative, discourteous, and insubordinate.

In light of the findings above, I recommend that performance of the play be canceled. I realize that this is a drastic step, and some disruption could result if the recommendation is carried out. However, I cannot, in good conscience, uphold any activity that would sacrifice human dignity in the interest of a temporary peace. (DX 4)

This memo was copied by Dr. Patterson to the Central High School Coordinating Committee and the following individuals: Gene Hooks, H. Benjamin Williams, Ruth Steele, Carolyn Weddle, Margaret Lanier, and Cheryl Shull. Shortly thereafter the controversy reached a climax in the media and among the faculty and students at Central High School.

14. It is obvious that Mr. Masem was highly upset by Dr. Patterson's memo, for he addressed the following memo to her on April 7, 1980:

Your memo of April 3 appears to me neither to have been appropriate nor in good faith. The limited assignment I gave you earlier this month was to help effect a compromise so that this play could go on, and to set in motion a process to avoid further controversies of this nature. To date, what you have effectively accomplished is:

1. To have rejected the compromise which you effected and seems to have been satisfactory to those participating in the play;

2. To have gone beyond your charge to effect a compromise and appear to have assumed the lead in opposing the play production; and

3. Rather than advising me directly as would be appropriate, to have chosen to send a memo to me with copies to six other individuals and the Central High School Coordinating Committee.

I have discussed the situation at Central with Mr. Gene Hooks, Principal. He has called together the play cast and the entire cast has decided that they wish to put the play on. Mr. Hooks has advised me that he is going to honor their request and, in effect, conform with the agreed upon compromise. I am backing the decision of Mr. Hooks and the students in question. (DX 6)

15. On the same day that he received the memo from Dr. Patterson (4–3–80), Mr. Masem wrote Dr. Benjamin Williams, the Associate Superintendent for educational programs, who is black, the following note on a copy of Dr. Patterson's memo of April 3, 1980:

I am denying this request. Please advise Dr. Patterson. Also, direct her to stay out of Central High School until she is specifically requested by Gene Hooks or specifically assigned by Ruth Steele to go there. She is to confine her activities at Central High School to those directly connected with her job. (DX 4)

The following notation appears below Mr. Masem's note to Dr. Williams: "Message given to Williams at 11:50 a.m. on 4–3–80 he has appt. with Ruth Patterson/Bus W at 5:00 p.m. 4–3–80." Dr. Williams stated that he passed along these directions to Dr. Patterson (T. 316–17). Dr. Patterson denies receiving any orders to stay away from Central High School. This conflict is unimportant because it is undisputed that on April 4, 1980 Dr. Williams wrote Mr. Gene Hooks, the principal at Central, the following memo with a copy to Dr. Patterson and others (Mr. Masem, Dr. Weddle, and Mrs. Beverly White):

I am advised of the concerns regarding the play, *You Can't Take It With You,* which is scheduled for public performance by Central High School seniors.

Please be informed that although there appears to be a number of concerns regarding the selection and performance of this production, I am not supporting the recommendation to cancel.

It is my understanding that earlier in the review of the expressed concerns regarding this play, three options were identified:

1. Cancellation

2. Recasting to reflect a better racial mix in characterization

3. Delete objectionable language from the script

I further understand that a select number of patrons and students met and discussed concerns about the play. From that discussion, the option for cancellation was eliminated. Recasting the play did not receive consensus. However, there was general agreement that at least the objectionable language could be cleaned up. As I understand it, that has been taken care of.

I personally plan to attend this production to make judgments for myself to see to what extent the request has been complied with. In the long run it is my intent to receive recommendations from Dr. Patterson and Mrs. White as to ways in which we will not have to react to such a problem in the future. This course of action is taken as a clear compromise. It is not the very best solution, however, I feel that it is one we can live with; with the understanding that the best solution will be provided with the new school year. (DX 5)

16. Unquestionably, a majority of the School Board, like Mr. Masem, were upset with Dr. Patterson's activities in the school play controversy. In fact Dr. Patterson herself testified that the controversy regarding the play was the principal reason for the opposition she encountered on the

Board when she applied for the supervisory position in question. On April 7, 1980 Mr. Masem addressed the following letter to members of the School Board:

Please be advised that some problems were brought to my attention concerning the production of *You Can't Take It With You* at Central High School. After consulting with Mr. Hooks, I was advised that he was calling a meeting of "concerned teachers", the play sponsor, play participants and their parents. The purpose of the meeting was to effect a "compromise" so that the play could go on.

Mr. Hooks advised me that the results of the compromise meeting were as follows:

1) The play would go on as scheduled.

2) Some "objectionable wording" which promoted racial stereotyping would be omitted.

3) If the play participants believed it advisable, some role shifting would take place. (The play participants didn't believe this was advisable)

4) An advisory committee would be established to screen productions to avoid future problems of a similar nature.

Since the compromise was effected, some new expression of the previous controversy has appeared. Mr. Hooks sees the original compromise as appropriate. Thus, he will be putting the play on as scheduled.

I concur with Mr. Hooks' decision and intend to support him. You should be advised that the parents and play participants are 100% behind the production. Opposition to the play has come from two sources:

1) Dr. Patterson and three black teachers at Central. (Attached is a petition signed by most black staff at Central)

2) The NAACP leadership has made an announcement and sent a letter concerning the play. (See attached) Please note that no action has been proposed by either the NAACP Board or the general membership.

The play is scheduled for Thursday and Friday of this week. Unless I hear that a majority of the Board is desirous of taking action contrary to that proposed by Mr. Hooks, the play will go on as scheduled.

Please find attached letters from two students who are in the play. They both express some concern about Dr. Patterson's role in the current controversy. (DX 3)

17. The depositions and testimony of the members of the School Board support Dr. Patterson's statement that her part in the school play imbroglio was a factor in her rejection as Supervisor of English and Social Studies in the Little Rock School District, but not as important as Dr. Patterson believes. The opinion of a majority of the Board was that Dr. Patterson had overreacted to parts of the play which she considered objectionable and that she had displayed poor judgment in this matter. Dr. Patterson's part in attempting to have the play canceled precipitated a number of the complaints to the School Board from faculty members and patrons of the district.

18. Since the play *You Can't Take It With You* was central to this litigation, I felt it appropriate that I should read the play in its entirety. The authors would undoubtedly be greatly surprised that this or any other of their many plays and musical comedies would be considered racist. *You Can't Take It With You* is generally considered to be their best artistic work. Moss Hart and George S. Kaufman collaborated on other successful dramas, including *The Man Who Came to Dinner* and *Once In A Lifetime*. Kaufman is also famous for writing the book for the classic musical *Of Thee I Sing*, the music to which was written by George Gershwin. Among Kaufman's many dramatic successes were *Dinner at Eight* and *The Solid Gold Cadillac*. Kaufman was a member of the Algonquin Round Table, that brilliant circle of artists who had such an influence on American art and criticism between the two World Wars and included Heywood Broun,

Alexander Woolcott, Franklin P. Adams, Dorothy Parker, Robert Benchley, Irving Berlin, Harold Ross and Herbert Bayard Swope among others.

Moss Hart, like Kaufman, was a leading figure in the world of musical comedy, being a frequent collaborator with Irving Berlin and Cole Porter. According to his autobiography, *Act I* (Random House 1959), Hart came from a poor New York Jewish family. His grandfather was a close friend and co-worker of Samuel Gompers and was one of the founders of the American Federation of Labor. His father was an ardent supporter of Eugene Debs. Both Hart and Kaufman for their time were considered among the most liberal members of the American artistic community.

19. The plot of *You Can't Take It With You*, which was produced in 1936, is principally concerned with the members of Grandpa Vanderhof's highly unconventional household. Grandpa himself quit "fighting, scratching and clawing" thirty-five years ago because "it just kind of struck me I wasn't having any fun." Grandpa has been "a happy man ever since." He goes to the zoo, attends commencements, reads, talks and has time "to notice when spring comes round." His daughter Penny aspires to write plays. She never finishes one because she gets a new idea and starts another play. Her husband Paul manufactures fireworks in the cellar; his assistant, Mr. DePinna, came one day to deliver ice and has been a member of the family ever since. Essie, the eldest daughter of Paul and Penny, makes and sells candy with the aid of Ed, her xylophone-playing husband, but her ambition is to be a ballet dancer. Without any semblance of talent, she constantly practices under the tutelage of Kolenkhov, a Russian refugee who longs for the days of the Czar and decries the Russian revolution. Ed, on the other hand seems to be an admirer of Leon Trotzky. Alice, the younger daughter of Paul and Penny, is a private secretary who is devoted to her eccentric family, although "she seems to have escaped the tinge of mild insanity that pervades the rest of them."

The attractions of this hedonistic household are starkly contrasted with the unpleasantly staid conventional attributes of the Kirbys when Alice announces her engagement to Tony Kirby, the son of her employer. An attempted dinner party bringing the families together ends in a near riot and a night in jail for both families. The arrests come about because Ed, who likes to print, has put a circular into his wife's candy, which he is selling. The circular reads: "Dynamite the Capitol! Dynamite the White House! God is the State; the State is God." All ends well, however, when Grandpa converts Mr. Kirby to his philosophy of life and Tony and Alice marry.

20. The problem perceived by Dr. Patterson in this hilarious comedy is in two black characters—Rheba, the black cook, and Don, her boyfriend. Rheba, however, in contrast to the rest of the household, is solidly conventional and sensible. Except for the fact that she is a cook, it is difficult to understand how this character could be demeaning to blacks. Her comments concerning the rather vacuous plots of Penny's plays are very perceptive. It is Rheba who realizes the real tragedy of the disastrous dinner party. When Don says, "I suppose, after all this, Mr. Tony ain't ever going to marry Miss Alice, huh," Rheba replies, "It's too bad, too. Miss Alice sure *loves* that boy." It is Rheba who realizes that Alice is really going away. "And she *going* all right no matter what they say. I know Miss Alice when she get that look in her eye." Shortly thereafter this colloquy takes place:

> Rheba: She ain't going to stay away long is she, Mrs. Sycamore?
>
> Penny: I don't know, Rheba. She won't say.
>
> Rheba: My, going to be lonesome around here without her.

Rheba thus identifies and cares greatly for the only normal member of the household. While she gently tolerates the others, she realizes that they are all slightly "touched."

It is true that Rheba refers to herself as "colored" on one occasion in the play and that she refers to whites as "Mr" and "Miss." Although this language was customary when the play was written fifty years ago, it was eliminated before the play was presented at Central High School.

Rheba's boyfriend, Donald, like the other members of the Vanderhof household, is a comic character. He runs errands for the family but is not paid because he doesn't want to affect his status on relief. In this regard Donald is no different from the white members of the Vanderhof family. Grandpa hasn't worked in 35 years; Ed's income the preceding year was $28.50. Paul and DePinna's manufacture of firecrackers seems to be more of a hobby than a gainful occupation. Donald's lack of a gainful occupation is consistent with the other members of the Vanderhof family and is no more demeaning to him than to the white characters in the play.

There is another character in the play which the script does not specify as black, but which was played by a black student. This is the character Gay Wellington, an actress whom Penny meets on a bus and brings home to read one of Penny's plays. It turns out that Miss Wellington is an alcoholic. She continues to drink as she reads and within a short time passes out. This character's language is not demeaning but she is an alcoholic, a malady that seems to affect a substantial number of actors and actresses. Before lapsing into unconsciousness, Miss Wellington in company with the other characters delivers some lines of high comedy. Other than the fact that the character is obviously an alcoholic, the part is not demeaning and as noted above it was not written for a black; it was played on Broadway by Mitzi Hajos, a white.

I am in agreement with Mr. Masem, Dr. Williams and a majority of the Board that Dr. Patterson was unduly sensitive and overreacted to a play that simply reflected the dialogue of its times (1936). By the exacting standards which Dr. Patterson sought to impose on this play, a substantial part of American drama and literature of the last century and a half would be unfit for production or reading. It is understandable that the Superintendent, many on the faculty, and a number of patrons would question whether a person with Dr. Patterson's propensities toward censorship and bowdlerism should supervise the teaching of literature and history in the district. In my view this was a legitimate question for the School Board to raise in connection with Dr. Patterson's qualifications.

23. The position of Departmental Supervisor—English and Social Studies, which is the subject of this litigation, was advertised on July 21, 1980. The qualifications for the position were listed as follows:

1. At least five (5) years' successful teaching experience.
2. A Master's Degree (Minimum).
3. Eligible for Arkansas Certification as a Supervisor.
4. Evidence of a strong commitment to quality integrated education.
5. Evidence of successful experience with parent and staff involvement. (PX 7)

There were five applicants for the position including Dr. Patterson and Mr. Marvin Zimmerman, who eventually was selected. Both of these individuals met the minimum qualifications for the position, although Dr. Patterson had the higher academic qualifications since she had a doctorate and Zimmerman only had a master's degree.

22. In conformity with district practice, a team of six interviewers interviewed the five applicants. Mr. Zimmerman had the highest score based on a consensus of the interviewers, who were evenly divided between blacks and whites. Mr. Masem testified, however, that one of the interviewers rated Dr. Patterson so much lower than any of the others that he believed this rating should be eliminated from consideration. If this is done, Dr. Patterson would be ranked highest in the consensus of the other five (DX 13).

23. After the interviews and in spite of the Central High incident with the play,

Mr. Masem recommended Dr. Patterson for the position of Supervisor of English and Social Studies. However, a majority of the School Board expressed opposition to her appointment. These expressions were made in an informal executive session. Mr. Masem then withdrew his recommendation and later recommended Mr. Marvin Zimmerman. This recommendation was accepted by the Board and he was placed in the job. While Zimmerman does not have a doctorate, his credentials are impressive (DX 16).

24. The opposition to Dr. Patterson from a majority of the School Board was based not only on the incident involving the play at Central High, but also on other factors. Some of the Board members believed that she was abrasive, did not get along well with faculty and staff and was lacking in interpersonal and management skills. This assessment is substantiated by an evaluation made of all supervisors in the school district by the district principals (PX 11). In all categories Dr. Patterson was rated last or next to last among the ten supervisors. She was rated last in interpersonal skills, assistance in program development and job implementation, and adequate feedback provided to principals. She was rated next to last in responsiveness to requests, knowledge of program or content areas, and ability to evaluate program or content areas. These evaluations strongly indicate that Dr. Patterson's performance in her previous supervisory position had left much to be desired. These poor performance evaluations would alone have justified the Board's passing over her.

25. The district had a policy of ability grouping at the secondary level. Dr. Patterson was vocal in her opposition to this policy. At least two Board members, who strongly supported this policy, felt that she was not supporting school district policy, and this attitude contributed in some degree to their opposition to Dr. Patterson.

26. I find that neither race nor sex was a significant factor in the School Board's failure to select Dr. Patterson for the position of Supervisor of English and Social Studies. I find that she was not selected for legitimate, non-discriminatory reasons. I further find that her failure to receive the position in question was not the result of her exercise of the right of free speech. Dr. Patterson was passed over by the Board not because she exercised free speech but because she carried out an assignment from the Superintendent in a manner that displayed poor judgment and a lack of understanding and appreciation for the views of others.

## CONCLUSIONS OF LAW

■ 1. The defendants selected a white male for the position of Supervisor of English and Social Studies instead of the plaintiff, a black female. Plaintiff was qualified for the position and she has therefore made out a prima facie case of discrimination.

2. Defendants have however articulated legitimate nondiscriminatory reasons for failing to select plaintiff. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff has failed to prove that these reasons are pretextual and has failed to sustain her burden on the whole case of proving discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ 3. Plaintiff contends that she was not selected for the supervisory position because she exercised her constitutional right of free speech in criticism of the senior play, *You Can't Take It With You*, and in demanding that it be canceled. In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) a teacher gave a radio station the substance of a memo relating to teacher dress and appearance. He claimed that the exercise of his First Amendment rights caused the School Board not to rehire him.

Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that his conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor"

in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct. (*Id.* at 287, 97 S.Ct. at 576)

This case does not present the same situation. If Dr. Patterson had not been selected because she issued a statement criticising the production of the play, her argument would have some force. However, here the Superintendent and Board found that Dr. Patterson was derelict in carrying out an official assignment given to her by the Superintendent. As Superintendent Masem stated in his memo of April 7, 1980 to Dr. Patterson:

The limited assignment I gave you earlier this month was to help effect a compromise so that this play could go on, and to set in motion a process to avoid further controversies of this nature. To date, what you have effectively accomplished is:

1. To have rejected the compromise which you effected and seems to have been satisfactory to those participating in the play;

2. To have gone beyond your charge to effect a compromise and appear to have assumed the lead in opposing the play production; and

3. Rather than advising me directly as would be appropriate, to have chosen to send a memo to me with copies to six other individuals and the Central High School Coordinating Committee.

It was the way in which Dr. Patterson handled this assignment rather than her exercise of free speech that caused the Board to question her judgment, managerial ability and interpersonal skills. In a recent decision from this district, *Bowman v. Pulaski Special School District,* 723 F.2d 640 (8th Cir.1983) the Court of Appeals pointed out that "the court must decide each claim on a case by case basis

giving full consideration to the government's interest in efficient public service. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1692–93, 75 L.Ed.2d 708 (1983)." *Id.* at 644. The court listed the factors to be weighed as follows at 644:

(1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties. *Id.* at 1692–93

If these factors are weighed in the case at bar, Dr. Patterson's actions are found wanting in each category. (1) There was a need for harmony here, and the Superintendent sent Dr. Patterson to Central High School to promote it. (2) The speech in question caused a deterioration in the relationship between plaintiff and her co-workers at a time when the school district's responsibilities required a close working relationship between plaintiff and her co-workers. (3) The time, manner and place of the speech here was, in the words of Superintendent Masem, "neither appropriate nor in good faith" (DX 6). (4) The context in which the dispute arose and the manner in which plaintiff conducted herself properly called into question her judgment and interpersonal skills. (5) Here the public interest would favor the production and examination of artistic creations free from censorship and black-listing and not disfavor the position taken by plaintiff that students should not be permitted to see a Pulitzer Prize drama written by two of America's leading playwrights. (6) The Board members were justified in finding that the speech impeded Dr. Patterson's ability to perform her duties.

4. Although Dr. Patterson contends that the school play controversy was the main factor in her non-selection, the Court

concludes that Dr. Patterson's exercise of her right to free speech was not the "motivating" factor. From the depositions and testimony of the School Board members, the principal reasons advanced were her abrasiveness, lack of interpersonal skills, and deficiency in managerial skills. The evaluation by the principals of her performance in her previous position would certainly furnish independent evidence of these failings. The School Board seemed to view her part in the school play controversy as simply an indication that she was lacking in the above described areas.

5. For the reasons stated, I find that the plaintiff has failed to sustain her burden of proving that she was not selected as Supervisor of English and Social Studies because she exercised First Amendment Rights.

6. Based on the above findings of fact and conclusions of law, the complaint of the plaintiff is denied and dismissed.