**Alfreda TRAHAN et al.**

v.

**LAFAYETTE PARISH SCHOOL BOARD et al.**

**Civ. A. No. 10903.**

United States District Court,
W. D. Louisiana,
Lafayette Division.

June 22, 1973.

Supplemental Opinion Aug. 29, 1973.

See also D.C., 330 F.Supp. 450.

---

4. Defendants of course are not without remedy under Fed.R.Civ.P. 26(c) if this mandate is violated.

Margrett Ford, Ford & Huckaby, Shreveport, La., for plaintiffs.

J. Nathan Stansbury, Dist. Atty., 15th. Judicial District, Lafayette, La., for defendants.

Donald E. Walter, U. S. Atty., and Robert E. Shemwell, Asst. U. S. Atty., for the United States, Gerald F. Kaminski, Justice Department Civil Rights Div., Education Section, Washington, D. C., amicus curiae.

## MEMORANDUM OPINION

PUTNAM, District Judge.

This motion is one in a long series of hearings since the beginning of this desegregation suit in 1965. The Lafayette Parish School Board seeks approval of certain new construction at public schools in the system. The plaintiffs-respondents seize this opportunity to seek re-establishment of the virtually all-black high school facility that was closed at the beginning of the 1970–71 school year. The question was relitigated fully in August, 1971, and the request denied after an extensive hearing. They also oppose the proposed construction on grounds that it would tend to encourage "white flight" from integrated schools by providing facilities in areas of growth near the city of Lafayette which are predominantly white.

 At the outset we deny plaintiffs-respondents' request to reopen Paul Breaux High School. These same parties, represented by the same counsel and joined by three other classes of intervenors brought this issue before us in August, 1971. The same reasons prevail now and we do not reiterate them here

in detail. See Trahan v. Lafayette Parish School Board, 330 F.Supp. 450 (W. D.La.1971). That judgment was not appealed as required by Singleton v. Jackson Municipal Separate School District, Part III, 419 F.2d 1211 (5 Cir. 1970), the parties had full notice thereof through their attorneys of record and it is final.

Moreover, reports filed by the Board as required by United States v. Hinds County School Board, 433 F.2d 611 (5 Cir. 1970), show that the facilities formerly housing Paul Breaux Elementary and High Schools are still in use as a vocational educational center and as an eighth grade school, on a fully integrated basis and after considerable expenditure of time and money, and that they have been so used since the beginning of the 1971–72 school year.

We turn next to a consideration of the evidence on movant's request for approval of school construction proposed to be undertaken. We find the evidence to be inconclusive, and cannot approve the proposed work on the basis of the information presented. As to such construction, including new schools, the Supreme Court of the United States in Swann v. Charlotte Mecklenberg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554 (1971) said:

"The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of the people. The location

of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods."

And again:

" . . . . In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or reestablish the dual system. When necessary, district courts should retain jurisdiction to assure that these responsibilities are carried out. Cf. United States v. Board of Public Instruction, 395 F.2d 66 (CA 5 1968); Brewer v. School Board, 397 F.2d 37 (CA 4 1968.)" (402 U.S. at 21, 91 S.Ct. at 1279, 28 L.Ed.2d at 569, 570.)

See also: United States of America v. Texas Ed. Agency, 5 Cir. 1972, 467 F.2d 848 at pp. 865, 866; and cases cited in note 27.

■ Among the factors to be considered by the Board are (1) *the school board's affirmative duty to consider race before proceeding with planned school construction,* United States v. Board of Public Instruction of Polk County, Fla., 5 Cir. 1968, 395 F.2d 66; Stout v. Jefferson County Board of Education, 5 Cir. 1972, 466 F.2d 1213; (2) the extent existing facilities can be utilized without an unreasonable burden on the students, Clark v. Board of Education of Little Rock School District, 8 Cir. 1971, 449 F.2d 493, cert. den. 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812;

(3) whether or not the proposed construction would be governed by segregated housing or in an open housing area, and the statistical growth of the area to be served by the new schools, i. e., whether composed of newcomers to the Lafayette area or simply "white flight" from the existing systems, (4) the correction of inequities that might exist in the present plan of operation, which was never intended as a permanent plan, Trahan v. Lafayette Parish School Board, supra, (5) the racial composition of the new schools, if in fact they are such, and related questions.[1]

■ The Court is confident that the board and its staff have carefully studied the needs of the school system and the pupils enrolled therein. Mr. Gauthe testified at the hearing that the expenditure of five and one-half million dollars contemplated at this time will only solve space problems for from two to five years, according to his estimate. We emphasize that this administrative decision is entirely up to the board; we do not and cannot pass upon the wisdom of the additions proposed, or whether or not more lasting benefit could be obtained for the system by other means. As a federal court, our only concern is whether or not the proposed work is within Constitutional bounds as outlined above.

■ The Biracial Committee established by the Court approved the purchase of property adjacent to the Plantation and Acadian elementary school sites. Both facilities presently serve grades K through 7.[2] Thus, the neces-

1. Respondents' expert witness, Dr. Feild, did not express any opinion on the plan presently in operation in Lafayette. He verbalized some of the general principles above announced, as did the Board's Superintendent and other witnesses in the case. Other related questions would include finances, land values, etc. as enumerated in *Swann,* supra.

2. The Biracial Committee's recommendations on school sites was forwarded to the Court under date of April 26, 1973,

and passed on by us to the Board on April 27. Copies of this correspondence is ordered filed as Court's Exhibits 1 and 2. The Committee's later action, on May 31, 1973, declining to approve the Board's proposals as a package is already in evidence. The "new school" propositions were withheld from consideration at that time because of the earlier site selection approval. It is apparent that, as Committee Chairman Bowles testified, the committee did not have full information regarding the projects. This Court finds

sity of establishing "new schools" and separating them into grade structures of K–4 and 5–7, with separate principals, lunchrooms, kitchens, and administrative staff, would seem to be unnecessary and could increase the per pupil expenditure in operating these schools to the point where it could conceivably work to the detriment of other schools in the system. Further, at Plantation, the effect would be to reduce the percentage of black-to-white children to about 7% in the K–4 school, while increasing it to 16% in the 5–7 school, thus tending to re-establish a dual or separate school structure at this location. More hard statistical data, as opposed to opinions and conjecture on (1) the projected population increases in Zone 6 and 6A, its satellite zone of predominantly black students in grades 5 through 7, must be produced, (2) together with statistical data establishing whether or not the new residents of the zone are the product of expansion and growth in the Lafayette area, or the product of what has been termed "white flight" from the newly integrated parish schools. The same is true in respect to Acadian Elementary and its zones 2 and 2A, and the Carencro High School proposals.

As to the new schools, if such they are to be, we must also be informed of the proposed administrative staff required as well as classroom teachers for each grade, and whether or not conventional or innovative instructional methods will be employed.

A review of the data filed by the Board in its semiannual reports indicates that the proposed improvements at Carencro Heights Elementary School and the Paul Breaux Vocational Center do not jeopardize the unitary status of the school system.

At this time, we do approve the Vocational Center proposals, as well as the transfer of temporary classrooms to Comeaux High School and to Prairie Ele-

mentary, all as outlined in the April 30th proposal, supplemented by the Superintendent's testimony. Since some restructuring of the grades at Carencro Heights and Carencro Elementary is proposed, we will await the information hereinafter ordered before giving this our formal approval.

## SUPPLEMENTAL OPINION

On June 7, 1973, this court heard evidence on the application of the defendant Lafayette Parish School Board for a declaratory ruling that certain proposed improvements to its public schools would not tend to reestablish a dual or segregated school system in this parish. It was opposed by plaintiffs in the suit, and on June 22, 1973, the Court ruled *denying the Board's motion in part.* The Court granted the motion insofar as it applied to Paul Breaux Vocational Center and movement of temporary classrooms to Prairie Elementary and Comeaux High Schools. A countermotion by plaintiffs to reopen as a full high school a former all-black campus formerly known as Paul Breaux High was denied. We also indicated that the Carencro Heights Elementary proposal would be approved in due course.

We stated on June 22, 1973, that the evidence presented by the Board was insuffficient to sustain its burden of proof that the proposed construction would not result in a resegregation of the system. The matter was one involving an expenditure of public funds in excess of five million dollars ($5,000,000.-00), and we spelled out in unmistakable language the factors to be considered by the Board and by the Court in making this determination.

Because of the impact of an expenditure of this magnitude on the school system as a whole, we did not finally rule the proposal out as impermissible. After spelling out the guidelines to follow, we granted the Board until June 29, 1973, to file additional statistical data in

that, even after a formal hearing, we do not have sufficient documentation to resolve these important issues and reiter-

ates its confidence in the Biracial Committee and its members.

support of its position. On June 29 certain data was filed pursuant to this order, and we immediately directed the plaintiffs to file any counteraffidavits on or before July 14, and that thereafter a report be made to the Court by amicus curiae on or before August 13, 1973. In due course, this report was filed.

Since an additional hearing would have ordinarily been required to permit cross-examination of the witnesses based upon the new material forthcoming as a result of these orders of the Court, on Friday, August 17 the Court, as a result of a telephonic conference, obtained a verbal agreement from all parties including amicus curiae, that the matter be considered and decided by the Court on the record as made up. This stipulation was to be reduced to writing and filed in the record.

On August 27, 1973, the stipulation was filed. We proceed to a final decision of the motion.

Based upon the record as a whole, we find as follows:

1. The defendant School Board proposed new construction and additions to various schools in the public school system first mentioned in the report filed with the Court on April 15, 1973. This report does not mention any changes in grade structure of existing schools or construction of new schools, only additions to existing schools. The proposal bears the date of January 10, 1973. Planning for this construction has been underway at least since that time.

2. On April 25, 1973, the Court initiated correspondence between the Board and the attorneys in the case, which resulted in submission of the Board's proposals for the selection of additional sites to the Biracial Committee and its approval of the acquisition of additional lands adjacent to Acadian Elementary and Plantation Elementary Schools, on April 26, 1973, which was transmitted to the Board on April 27. At the June 7 hearing, Mr. Bowles, Chairman of the Committee, testified that the subcommittee appointed by him had visited the proposed sites, and that he had polled the remaining members by telephone for the final vote. He also testified that the full proposal of the Board was not made known to them and the entire matter was not explained until a subsequent meeting, when the Committee voted not to approve the proposals. Copies of these letters and Committee resolutions are attached. We agree, and find that the Biracial Committee did not have sufficient information before it on the date of its last meeting, May 31, 1973, to make an intelligent recommendation to the Court.

3. It was not until April 30, four days after the Biracial Committee had approved the purchase of additional lands as above set forth, that the Court was furnished with a more detailed report indicating that totally new schools were proposed for the Plantation and Acadian Elementary School sites; a new school to house grades 5 through 7 at the former, and a new school to house kindergarten through 3rd grade at Acadian Elementary.

4. The Plantation Elementary School Zones, shown as Zone 6 and 6A on Board's Exhibits 1-b-3 filed June 29, 1973, show that there are practically no black students residing in Zone 6, and that the satellite zone 6A furnishes practically all of the black students in grades 5-7 at this school. These students are bussed to the school from a distance of some five miles, across the Vermilion River, the Evangeline Throughway, and the Southern Pacific Railroad track. The proposal to separate this school into two schools, with a separate cafeteria, classrooms, principals and administrative personnel, playground, etc., will violate the decree of this Court dated August 17, 1971, Paragraph IV, and result in a reduction of the black-to-white ratio in grades K-7 (the new school) to 7% black in 1974, while increasing the ratio to 16% black in the 5-7 grade (Middle) school.[1]

---

1. There are several alternatives suggested by plaintiffs. Facilities at LeRosen Elementary School have not been considered by the Board and can be utilized in solving any overflow

5. Acadian Elementary is in a similar position. According to the maps filed on June 29, 1973, there are only five black students actually residing in Zone 2, which is the primary zone for this school. All other blacks are bussed in from the Satellite Zone 2A, across Interstate Highway I–10, the Evangeline Throughway, and the Southern Pacific Railway, a distance of approximately 4.1 miles, according to Mr. Gisclaire's testimony. Acadian Elementary has a capacity of 999 students and at the end of the 1973 school year there were 976 students enrolled therein, or 23 students below capacity.

6. There are existing facilities at Faulk Elementary (Zone 14) serving grades K–4, available to students in Zone 2 from these grades. This school has a capacity of 1026, and was 99 seats below capacity, or four empty classrooms. The Board did not consider these facilities in its planning, nor did it consider Alice Boucher, K–3, which has a capacity of 972 students and at the close of 1973 was 321 below capacity or 12.84 vacant classrooms based on 25 students per room, as used by the Board, rather than 4 as shown on the Board's report of June 29, Item 1–a.

7. In short, Item 1–a shows a total of 3188 vacant seats in the entire elementary school system, or 13.2% below capacity, which have not been considered by the Board and some of which might be utilized to alleviate the overcrowding alleged to be imminent at Plantation and Acadian Elementary Schools, while at the same time substantially decreasing bussing distances and keeping racial ratios at these facilities.[2]

8. Item 1–b–1 does not comply with the requirements of our order of June 22 as to Plantation and Acadian Elementary Schools. While Superintendent Gauthe and other staff members testified that with the new construction there will be four schools where there are presently two, the projected enrollments for the years 1973–74, 74–75 and 75–76 give figures for the schools as though the grade structure and administrative organization is unchanged. Further, an unsigned note attached as Item 1–b–3 states that projections of population location in the Plantation and Acadian areas cannot be made by the Board at this time.

9. Comeaux High and Carencro High are two of five high schools operated by the Board. Systemwide, the high school structure at the close of the 1972–73 school year was as follows:

| ZONE | SCHOOL | STUDENTS | CAPACITY | PORT. RMS. | UNDER CAP. | % BLK. |
|------|--------|----------|----------|-----------|-----------|--------|
| 23 | Carencro | 925 | 1100 | 0 | 175 | 14.7 |
| 24 | Acadiana | 1801 | 2200 | 10 | 399 | 9.8 |
| 25 | O. Comeaux | 1195 | 1425 | 12 | 230 | 17.5 |
| 26 | Northside | 1461 | 1750 | 3 | 289 | 39.2 |
| 27 | Lafayette | 2368 | 2650 | 10 | 282 | 23.2 |
| | | 7750 | 9125 | | 1375 | |

at Plantation that might arise in this immediate future. It is also shown that Plantation Elementary School was only 7 students below its capacity of 965, at the end of the 1973 school year, while LeRosen was 235 below its capacity of 486 students at that time. In 1972 enrollment at LeRosen totalled 265, 64% black; at the end of 1973, 251, 68.9% black. Here enrollment is decreasing.

2. Paul Breaux Elementary, an eighth grade facility, is included in calculating the capacity of the entire elementary school system. Without Paul Breaux, there would be 2820 vacant seats or 12.5% below capacity. In the Board's response of June 29, 1973, item I–(a), we note a discrepancy in the figures given for Broadmoor Elementary, viz: although Broadmoor has a total student enrollment of 545 with a capacity of only 486, there is one vacant classroom available.

These statistics, taken from the report filed by the Board in April, 1973, demonstrates that present student population is 85% of capacity. Acadiana High was not opened until the 1969–70 session. It was constructed after this suit was commenced in an area then sparsely populated but which is now building rapidly. On September 26, 1969, total enrollment was 1114; its capacity was 1350. Already its capacity has been increased by additional construction completed in 1971 and the addition of temporary classrooms thereafter to a total of 2200. The original enrollment was 12.6% black; it has dropped to 9.8% black in 1973. The improvements made subsequent to construction of the school were not called to the attention of the Court and went unchallenged.[3]

## CONCLUSIONS

The additional material filed by the Board after our ruling on June 22 does not establish by preponderance of the evidence that the proposed improvements are permissible under the principles of federal law applying to this case which we set forth fully therein, insofar as Ovey Comeaux, Carencro High, Acadian and Plantation schools are concerned, and for the reasons therein set forth we must deny the Board's application and restrain it from proceeding with construction. Unfortunately, after the ruling of June 22 was issued in which the Court strongly indicated that construction at these sites should await a study of the entire

system as ordered by us on that date, the Board advertised for bids for the Comeaux High construction. This bid was let on Friday, August 17, 1973, according to newspaper reports, reaching us. From these reports it is also indicated that some of the Board members were unaware of the previous ruling of the Court. The file reflects that the Superintendent of Schools was personally handed a copy of the ruling and order on June 22, and copies were mailed to all attorneys of record representing the parties.[4]

The proposed improvements at Carencro Heights Elementary School are well-planned and supported by facts. This project will be approved and allowed as we indicated on June 22, 1973.

This Court wishes to dispel any question that its action in this case has been influenced in the least by the news reports above referred to and the letting of the bids. Our opinion was expressed formally and in writing shortly after submission of the first evidentiary hearing as set forth above.

The Lafayette Parish school system must grow to keep pace with the rapid population increases, established by the affidavits of Mr. Angers, Mr. McGlasson, Mr. Gankendorff. At the same time, the Board must achieve and maintain a unitary school system. Piecemeal development and planning on a short range basis has resulted in a marked tendency to revert to a dual system as reflected by this record. The Court cannot, in good conscience, allow this to occur, with the

3. According to the "Hinds County" report filed by the Board in May, 1972, the total student enrollment at Northside High School was 1481, of which 37.2% was black. The Board's response of June 29, 1973, item I–(a), indicates a drop in total student enrollment to 1461, of which 39.2% was black. While there was an *increase in black* students, there was a *decrease in white* students attending Northside High from the end of the school year in 1972 to the end of the school year 1973.

The new construction at Acadiana High, as well as the enlarged capacity at Ovey Comeaux High and Plantation Elementary, by adding temporary classrooms no doubt

contributed as a major factor to the gradual regression of the percentage of integration at Northside High and LeRosen Elementary (supra, n. 1). These examples of what has happened in the Lafayette public school system since implementation of the 1971 decree are by no means all inclusive. Alice Boucher Elementary and J. W. James Elementary are in the same category according to statistics in the record filed by the Board.

4. Local news media were advised of this decision and the information was presumably disseminated to the general public through these channels.

disastrous after effects that must surely follow.

Using our opinion of June 22 as a guide, the Board may eventually justify some or all of the proposed improvements, but the entire system must be studied and permanent zone lines drawn, inequities presently inherent in bussing from satellite zones corrected if possible, and capital investment made to the benefit of the system as a whole and the entire student population, rather than any particular segment thereof.

A formal decree will be issued in keeping with the foregoing and in accordance with our order of June 22, 1973.