498 F.2d 195
 Frank V. THOMPSON et al., Appellants,
v.
The SCHOOL BOARD OF the CITY OF NEWPORT NEWS, VIRGINIA and
George J. McIntosh, Division Superintendent of
Schools for the City of Newport News, Appellees.
 No. 74-1005.
 United States Court of Appeals, Fourth Circuit.
 Argued April 2, 1974.
Decided May 31, 1974.
 
 James W. Benton, Jr., Richmond, Va. (Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, New York City, Henry L. Marsh, III, S. W. Tucker, Philip S. Walker and Hill, Tucker & Marsh, Richmond, Va., on Brief), for appellants.
 Robert V. Beale, Newport News, Va. (Bateman & Beale, Newport News, Va., and Panos A. Yeapanis, City Atty., for Newport News, Va., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL, FIELD and WIDENER, Circuit Judges, sitting en banc.
 PER CURIAM:
 
 
 1
 In Thompson v. School Board of City of Newport News, Va. (4th Cir. 1972) 465 F.2d 83, we remanded this proceeding, instituted to achieve the desegregation of the public schools of the City of Newport News, to the District Court with direction that the Court should consider and make findings on these two issues:
 
 
 2
 (1) Whether, after considering any alternate plan submitted by the plaintiffs, and taking into consideration the ages of the pupils involved, the problems of transportation and the educational program itself, any plan other than neighborhood zoning was practical for grades 1 and 2 in such school system?
 
 
 3
 (2) Whether groupings of grades 3, 4 and 5 in formerly identifiable white schools and grades 6 and 7 in formerly black identifiable schools under the plan of desegregation 'were based on non-discriminatory grounds'?
 
 I.
 
 4
 The District Court, on remand, held a hearing, allowed the plaintiffs to submit their alternative plan for the assignment of pupils in the first and second grades, and, after considering the evidence submitted in support of that alternative plan, found that it, prepared concededly without consideration of the difficulties of transportation 'as a factor' and without any substantial familiarity with the school district's physical facilities or even special education programs, was neither 'practical' nor 'feasible'.[1] It proceeded to review in some detail the facts developed in connection with the Board's plan for neighborhood assignment of pupils in these two grades both at previous hearings and at the hearing held after remand, and, on that record, it reaffirmed the neighborhood plan previously developed, basing such finding on 'three factors-- (1) the transportation problems within the city, (2) the educational process, and (3) the health and ages of the very young children who would be transported * * *.' Such findings are not clearly erroneous and must be affirmed.
 
 II.
 
 5
 The District Court was instructed, also, that on remand, it should make findings on whether the assignments of grades 3 to 7 'were based on non-discriminatory grounds.' At the hearing held after remand, the School Board stated the reasons that led to its grouping of these grades. As explained by the school officials directly concerned in the drafting of the Board's plan, these reasons were:
 
 
 6
 '* * * Well, the original testimony pointed out the uniqueness of Newport News with regard to shape and the housing patterns that had developed in the city, the almost complete separation of the races.
 
 
 7
 With a ratio of thirty-six and a fraction to sixty-three and a fraction, or roughly 60-40 or three to two, it becomes obvious that if you are going to take two widely separated areas and mix them in any manner that would approach that, it is necessary to vacate 60 percent of the classrooms in the black area and 40 percent of the classrooms in the white area and transport to that enough blacks and whites to fill those classrooms and replace them.
 
 
 8
 So it became a three to two ratio.
 
 
 9
 Now, with five grades involved, that falls into a three to two pattern very readily. Anything else caused us-- causes us very quickly to arrive at a point where we exchange white children for white children. So we tried to-- this was why we originally selected two grades instead of three and had a two-five split to give us the three-two pattern.
 
 
 10
 The question of who should go first was a matter of choice.' (Tr. pp. 141-2.)
 
 
 11
 The District Court concluded that the grouping of these grades was satisfactorily explained' in the testimony of the school officials, and it accordingly found 'that the distribution of the white and black children for grades three through seven was nondiscriminatory.' We find no error in this conclusion. We might observe as we did in the earlier opinion herein[2] that the grade distribution as approved is similar to that approved in Allen v. Asheville City Board of Education (4th Cir. 1970) 434 F.2d 902; Clark v. Board of Education of Little Rock School Dist. (8th Cir. 1971) 449 F.2d 493, and Hart v. County School Board of Arlington Co., Virginia (D.C.Va.1971) 329 F.Supp. 953, aff., 459 F.2d 981 (4th Cir.), cited in the earlier opinion in this case.
 
 
 12
 The orders of the District Court, from which this appeal is taken, are accordingly affirmed.
 
 
 13
 Affirmed.
 
 WINTER, Circuit Judge (dissenting):
 
 14
 For the reasons set forth by Judge Butzner, in whose opinion I join, I, too, dissent. I add only a few comments of my own.
 
 
 15
 With respect to the apparently uneven burden on black pupils in grades 3 to 5, I think that the decision of the district court is presently indefensible. The inquiry and findings that we directed to be made in the last appeal were not made. Certainly if the choice to transport only black students in grades 3 to 5, made by a school board which historically has demonstrated its unwillingness to bring itself into compliance with Brown, was non-discriminatory, the basis for the choice is undisclosed. And, as Judge Butzner convincingly demonstrates, the present record does not demonstrate that the choice must be made on an all or none basis. Reversal and remand of this portion of the district court's order should inescapably follow.
 
 
 16
 I would reverse and remand as to the treatment of grades 1 and 2 also. This may well be a school district in which total dismantling of a dual system of schools is not required under Swann, but the present record does not lead me to that conclusion. The record shows that, prior to 1971, over 22,000 of the total school population of 31,500 pupils were transported to segregated schools by bus. At the present time, over 25,000 of the approximately 28,000 students are bused; and over 50 percent of the students in grades 1 and 2 are transported to segregated classes. If grades 1 and 2 are to be totally desegregated, the total number of students to be bused will be increased. But just as neighborhood schools are not per se valid, so is busing not per se invalid. The length and time of transportation, with consequent burden and perhaps detriment to the students, are pertinent factors to determine the feasibility and necessity of busing. While we may speculate in a school district of this size, shape and demographic composition as to the distance and time of busing necessary to achieve a totally unitary system at grades 1 and 2, the fact is that the district court has made no findings in this regard. Logic and a sound basis of decision require a survey and findings of the burden of present busing, past busing and future busing under various plans of integration before any conclusion could be drawn that achievement of a totally unitary system at grades 1 and 2 would or would not be deleterious to the health of the students involved. And, again, even if it is concluded that achievement of a totally unitary system should not be ordered, the achievement of some desegregation in grades 1 and 2 should not go unexplored.
 
 
 17
 Finally, I record my suspicion of the basis on which the district court approved retention of a dual system for grades 1 and 2. It relied geavily on the testimony of Dr. Hogge, a pediatrician, to the effect that the health of students in kindergarten and the first and second grades would be adversely affected if they were not permitted to attend neighborhood shcools. But as I read the testimony of Dr. Hogge, it was-- beside the obvious that there are limits to the physical endurance to children in grades 1 to 7, and if transportation, coupled with the usual school day, exceeded those limits, the effect would be deleterious to the child-- that the effect of transportation on the physical and mental health of a child depends upon whether he is happy which, in turn, depends upon whether he is transported to a school 'of his choice or his parents' choice.' If the child is unhappy, i.e., not transported to a school of his choice or his parents' choice, 'then it follows from there, as the night does the day, that you're just going to have a poor situation.' Acceptance of Dr. Hogge's thesis, it seems to me, would be to require application of the equal protection clause to depend upon a plebecite by parents. This is a novel doctrine which I do not think finds support in the authorities.
 
 
 18
 BUTZNER, J., joins in this dissent.
 
 BUTZNER, Circuit Judge (dissenting):
 
 19
 Under familiar principles, the burden is placed on a school board which formerly operated statutorily segregated schools to establish that it has eliminated its dual system. Green v. County School Board, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Eighteen months ago we found that the record in this case was insufficient to show compliance with this well established rule, and we remanded the case for reexamination of the school board's plan and for consideration of alternative feasible plans for the assignment of pupils to elementary schools. Thompson v. School Board of the City of Newport News, Virginia, 365 F.2d 83 (4th Cir. 1972). Both our past and present inquiries are directed at two aspects of the problem: first, the propriety of not integrating grades 1 and 2, and second, whether the grouping of the other elementary grades was based on nondiscriminatory grounds.
 
 
 20
 The district court's findings and conclusions respond in great detail to our inquiry concerning grades 1 and 2. Given the distance and time required to bus these young children from some white neighborhoods to some black neighborhoods and vice versa, the court's approval of the plan would probably not have been error if this were its only questionable feature. See Swann v. Board of Education, 402 U.S. 1, 30, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (dictum). However, the assignment of pupils in the first two grades connot be viewed in isolation from the assignment of other elementary pupils. And this leads us to the more difficult aspect of the problem-- the justification for the disparate treatment of white and black pupils in the other elementary grades.
 
 
 21
 The district court made no attempt to state findings and conclusions to explain its approval of transportation of nearly all black children in grades 3 through 5 out of their neighborhoods while most white children are not required to leave their neighborhood schools until they attend grade 6. The court simply stated that the testimony of two school officials satisfactorily explained the methods utilized for assignments. Without giving any reasons, the court added that it found the distribution of pupils for grades 3 through 7 was nondiscriminatory.[1]
 
 
 22
 I find this part of the district court's memorandum both procedurally and substantively inadequate. It requires the court of appeals to initially make findings and provide a rationale of decision. Consequently, it either denies the parties realistic appellate review or thrusts this burden on the Supreme Court. The absence of findings and conclusions in this case fully demonstrates the wisdom of generally requiring compliance with Rule 52(a).[2]
 
 
 23
 Counsel for the school board selected an excerpt from the testimony of one witness as the finding that filled the vacuum left in the district court's memorandum decision. The majority has adopted this excerpt as the pertinent finding of fact on which its opinion depends. No one, however, has identified the relevant testimony of the other witness to whom the district court adverted. It is fair to assume, therefore, that the testimony quoted in the majority opinion is the only evidence tending to justify the disparate treatment of white and black pupils in grades 3, 4, and 5.
 
 
 24
 The district court's opinion substantively errs because the excerpt from the testimony which undergirds it is based on a faulty premise. The school officials treated each grade as a monolithic unit. Actually, the record shows that each grade is composed of many classes, but no explanation is given why classes for grades 3, 4, and 5 in predominately black schools cannot be paired or clustered with predominately white schools in adjacent or nearby zones. While this would not affect all pupils in the elementary grades, it would allow some of the black children in grades 3, 4, and 5 to enjoy the advantages the school board claims for neighborhood schools, a privilege now accorded only to white children in these grades.
 
 
 25
 The excerpt from the testimony shows that it was a matter of choice for the school board to start busing all of the black children out of their neighborhoods at grade 3 while leaving white children in their neighborhoods until grade 6. But the excerpt, and the opinions of both the district court and this court fail to furnish any rational explanation for this choice.
 
 
 26
 It is, of course, not feasible to equalize transportation time and distance for each child, and we have never insisted that this be done. But previously when a charge was made that the burden fell more heavily on one race, we have examined the facts in the light of the explanation offered by the board. See, e.g., Hart v. County School Board of Arlington County, 459 F.2d 981 (4th Cir. 1972); Allen v. Asheville City Board of Education, 434 F.2d 902 (4th Cir. 1970). And implicitly we have subscribed to the maxim, 'the burden (of desegregation) on all students, black and white, should be as equitable as possible.' Clark v. Board of Education of Little Rock School Dist., 449 F.2d 493, 499 (8th Cir. 1971). The instant case departs, I believe, from out sound practices and precepts.
 
 
 27
 Because this record engenders doubts about whether black and white pupils have been treated evenhandedly, I would again vacate the judgment of the district court. This time, however, I believe specific instructions would more likely be productive. I would remand the case with directions that the court ascertain a suitable maximum distance and time for busing pupils enrolled in the elementary grades.[3] Operating within this framework, the district court should then determine whether an equal or greater degree of integration could be achieved in elementary classes without placing an undue burden on children of one race. Moreover, busing within workable parameters may facilitate integration of a number of classes in grades 1 and 2.
 
 
 28
 The school board has twice failed to affirmatively establish that it has achieved maximum integration considering the peculiar geographic complexities of the city. Therefore, I would authorize the district court to tax as costs against the board a reasonable fee for a consultant, selected by the plaintiffs, to devise a plan or plans better calculated to comply with the law.
 
 
 29
 WINTER and CRAVEN, JJ., join in this dissent.
 
 
 
 [1]
 Dr. Strickler, who prepared on behalf of the plaintiffs the alternative plan, testified that, in designing the plan, he 'eliminated * * * as a factor' any difficulties of transportation and justified his action by stating that, in his opinion, 'time and distance of travel' were not proper matters for consideration even when preparing a plan for pupils as young and immature as first and second grade students. Under his plan, some of these pupils would have had travel time, including loading time, of almost two and a half hours a day, and the mean travel time for all such pupils in the school system would have been almost two hours. It was Dr. Strickler's view, as testified to by him, that transportation of pupils in the first and second grades in order to establish a fixed ratio in each school, regardless of 'time and distance of travel', was the overriding consideration in preparing a plan of desegregation. Cf., however, Northcross v. Board of Education of Memphis (6th Cir. 1971), 444 F.2d 1179, 1183, and 466 F.2d 890, cert. denied, 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 (1974). It was, also, suggested that these elementary pupils were already being bussed in substantial numbers. This argument would disregard the fact that this bussing was within the neighborhood zones and involved no considerable distances or time; the transportation was not from the tip of the uniquely shaped school district where the so-called black pupils were concentrated to the distant zones of the areas where the greater number of whites lived (the mean distance would be over twelve miles)
 
 
 [2]
 465 F.2d at p. 85
 
 
 [1]
 After paraphrasing our inquiry pertaining to elementary grades 3 through 7, the court wrote:
 'Through testimony from Messrs. McIntosh and Greenwood, the reasons for the method utilized were satisfactorily explained and the Court finds that the distribution of the white and black children for grades three through seven was nondiscriminatory.' Thompson v. The School Board of the City of Newport New, Virginia, 363 F.Supp. 458 (E.D.Va.1973).
 This paragraph constitutes the entire district court findings of fact and conclusions of law on this issue.
 
 
 [2]
 Fed.R.Civ.P. 52(a) provides in part:
 'In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon . . ..'
 A leading commentator on the rules has stated, 'The requirement that the trial court find the facts specially and state separately its conclusions of law is mandatory and must be fairly observed.' 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil 2574, at 690 (1971).
 
 
 [3]
 A number of cases deal with the distance and time required for busing. The most notable is Swann v. Board of Education, 402 U.S. 1, 30, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971), where the Court said:
 'The decree provided that the buses used to implement the plan would operate on direct routes. Students would be picked up at schools near their homes and transported to the schools they were to attend. The trips for elementary school pupils average about seven miles and the District Court found that they would take 'not over 35 minutes at the most.' This system compares favorably with the transportation plan previously operated in Charlotte under which each day 23,600 students on all grade levels were transported an average of 15 miles one way for an average trip requiring over an hour. In these circumstances, we find no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation. Desegretion plans cannot be limited to the walk-in school.'
 The record discloses that as recently as 1971 the City of Newport News transported more than 22,000 pupils to segregated schools. Even now, about one-half of the first and second grade pupils are being transported to segregated classes. In formulating its criteria for maximum allowable distance and time, the court may take into consideration the characteristics of this transportation.